UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA WATTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 18-cv-1390-JES-TSH |
| | ) |
| METHODIST MEDICAL CENTER | ) |
| OF ILLINOIS, a/k/a PROCTOR HOSPITAL, | ) |
| a/k/a UNITY POINT HEALTH CARE, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

This matter is now before the Court on Defendant The Methodist Medical Center Of Illinois' ("Methodist") Motion (Doc. 31) for Summary Judgment. For the reasons set forth below, Defendant's Motion (Doc. 31) is GRANTED.

### BACKGROUND

Two months after the Court informed Plaintiff that the Court would no longer accept her Response to Defendant's Motion for Summary because Plaintiff failed to timely respond or move for an extension of time, Plaintiff filed two identical Motions (Docs. 32, 33) for Leave to file Response to Defendant's Motion. Pursuant to Local Rule 7.1(F), "[i]f filing a document requires leave of the court, the filing party must attach the proposed document as an exhibit to a motion to file." Plaintiff has failed to attach the proposed brief to her Motions for Leave and has not made any attempt to do so since filing her Motions. Therefore, the Court denies Motions (Docs. 32, 33) for failure to comply with the local rules. This Order on Defendant's Motion (Doc. 31) for Summary Judgment follows.

1

Plaintiff has failed to file a Response to Defendant's Motion, therefore the following facts listed in Defendant's Motion are considered undisputed by the Parties.[1]

Plaintiff Lisa Watts ("Watts") is a licensed clinical social worker in Illinois. (Watts Dep., p. 9). On December 5, 2016, Watts was employed by Methodist as a mental health clinician, primarily working with children and teenagers in an outpatient setting. Her duties included conducting initial assessments, creating a treatment plans, and providing counseling and therapy to children from ages 4 to 18. With older teens, the therapy sessions were often one-on-one and for younger patients, family members were often present. These counseling and therapy services addressed a variety of mental health issues, including anxiety and depression. Watts also provided counseling and therapy to adults and led group therapy in a partial hospitalization program. (Watts Dep., pp. 12, 43, 47-48); (Jaegle Dec., ¶ 3).

In December 2016, Methodist had a Fit for Duty Assessment policy. The policy promoted an environment free of alcohol/drug use and misuse in compliance with the Drug Free Workplace Act and a safe and healthy environment for the staff and patients. Under the policy, a fit for duty assessment may be required for a variety of situations, including, but not limited to, rambling, fast speech, out of the ordinary, bizarre behavior, extreme outburst without provocation, and disorientation. Under the policy, immediate termination would result if an employee refuses to

---

[1] *See* Local Rules 7.1(D)(1), (d)(2)(b)(6) ("Within 21 days after service of a motion for summary judgment, any party opposing the motion must file a response. A failure to respond will be deemed an admission of the motion."; "A failure to respond to any numbered fact will be deemed an admission of the fact."). The Seventh Circuit has repeatedly affirmed district courts' strict application of local rules that streamline summary judgment. *See e.g.*, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994). Local rules are not "mere formalit[ies]," a failure to follow them can be fatal to one's claim. *Id*. Moreover, this is not an isolated incident, Plaintiff's counsel has repeatedly failed to timely respond to motions and comply with court orders, which previously resulted in warnings, sanctions, and admonishment from the Court. *See e.g., Henseler v. Cook Canton, LLC*, No. 18-1363 (C.D. Ill.), Text Order dated 2/25/2021. Counsel's response in *Henseler* became due around the same time as counsel's response here based on previously granted motions for extensions of time requested in *Henseler*. Counsel chose to respond to the defendant's motion in *Henseler* and ignore his Response due here. In the Court's 2/25/2021 text order in *Henseler* admonishing counsel for failing to timely file the exhibits associated with his response to the defendant's motion, the Court also alerted counsel that his Response here was overdue. Yet, counsel continued to ignore his obligation to his client. Due to this decision, Plaintiff's Response has been waived.

submit to a drug/alcohol screen. (Jaegle Dec., ¶ 13). Methodist worked with the Illinois Work Injury Resource Center ("IWIRC") to complete fit for duty examinations, including drug and alcohol testing. During business hours, specimens were obtained at IWIRC. (Jaegle Dec. ¶ 14).

In December 2016, Angie Moore ("Moore") was employed by Methodist in the position of Compliance Officer. At that time, Moore was a licensed clinical professional counselor in Illinois. (Moore Dec., ¶ 2). On December 5, 2016, Watts contacted the Compliance Department asking to speak with Moore. Watts indicated that she only wanted to speak with Moore (and only in person) as she believed the phone lines were tapped. Moore then called Watts and left a message. Watts then called Moore back and proceeded to discuss her concerns. Watts indicated that her supervisor, Marianne Dungan ("Dungan"), was involved in delaying the care delivered to her father in the Emergency Department of Methodist ("ED") with the hope that he would not survive, so Watts would not miss any more work. Specifically, Watts alleged that Dungan had worked with the behavioral health staff and medical staff to withhold fluids and other necessary interventions to her father, which caused him to code and almost die. Watts alleged that Dungan told the staff words to the effect of "this is Lisa's dad and we don't like her so let's not treat him." When Moore repeated this information back to her in an attempt to clarify, Moore told her this is a serious allegation— that Dungan was trying to kill her father. Watts said "yes, but it had happened." (Moore Dec., ¶ 5); (Watts Dep., pp. 66-68).

Watts also reported that Dungan illegally accessed records and conducted long term "harassment and persecution" including negative feedback on evaluations and harassing texts. Watts described being afraid of Dungan. Watts stated she could not go to the Director, Dean Steiner, because Dungan and Steiner had been friends for 25 years and there were many conflicts of interest. (Moore Dec., ¶ 6); (Watts Dep., p. 69). Some reports from Watts did not sense make

to Moore. *Id*. Watts was crying and hysterical at times during the call indicating she did not know what to do. When Moore asked Watts if she was "okay," she responded "no." When Moore expressed concern that she was seeing patients today, Watts agreed she did not think that she should see patients. Moore asked if someone could come to talk to Watts in her office and she said "yes." (Moore Dec., ¶ 8); (Watts Dep., pp. 69-70). Moore then contacted another employee of Methodist for additional follow up. (Moore Dec., ¶ 9).

In December 2016, Methodist employed Jan Carroll ("Carroll") as a Nurse Manager in the Adult Behavioral Health Unit and Kathy Jaegle ("Jaegle") as of Director of Compensation and Integration. On December 5, 2016, Jaegle received a call that Watts needed to be checked on and a fit for duty assessment might be needed based upon Watts' behavior, which included crying. (Jaegle Dec., ¶¶ 2, 4). That same day both Jaegle and Carroll met Watts in her office on 7 West. After knocking on the door, Watts answered it and Carroll and Jaegle asked to talk to her. When they arrived, Jaegle told Watts that they were there to make sure she was "okay." (Jaegle Dec., ¶¶ 4-5) (Carroll Dec., ¶ 3); (Watts Dep., pp. 71, 81) Carroll confirmed if Watts knew both of them and she said "yes." Thereafter, Watts said, "I never thought this would go on here." She then recounted her past work history on a medical unit at Methodist and her move to Florida with her husband who was in the service. She then talked about moving back and working at the VA. (Jaegle Dec., ¶ 6); (Carroll Dec., ¶ 4); (Watts Dep., p. 73). Watts spoke extensively about incidents at the VA being investigated and how her co-worker committed suicide. Watts became emotional about his suicide and blamed herself—feeling like she could have done more for him. (Jaegle Dec., ¶ 6); (Carroll Dec., ¶ 5); (Watts Dep., pp. 73, 78-79). Watts spoke about returning to Methodist because she felt close to the organization.

4

Next, Watts talked about statements or questions that Dungan made during her interview and questioned why she would have said that. She made several references to co-workers on 7 West that she knew for years then seemed angry about a former employee who worked as a Mental Health Counselor on 8 West and was an assistant manager in the Behavioral Health Emergency Department ("BHED") at that time. (Jaegle Dec., ¶ 6); (Carroll Dec., ¶ 6). Watts then expressed feeling that Dungan was against her and that the assistant manager in the BHED was in on it too. (Carroll Dec., ¶ 7). Carroll and Jaegle felt it was hard to follow Watts' train of thought during the meeting and Watts was emotional. Watts referenced messages on her cell phone from Dungan when Watts communicated about missing work due to her father's illness. Watts talked about her father being a patient on 8 Hamilton and stated that Don Dungan, Dungan's husband worked on that unit. She said she was glad that she saved the voicemails. Watts stated she believed Dungan was culpable for her father's care at the hospital in October 2016. She alleged other employees had conspired against her and intentionally jeopardized her father's care. (Jaegle Dec., ¶¶ 7, 8); (Carroll Dec., ¶ 8); (Watts Dep., pp. 76-78). Jaegle verified some dates with her, but otherwise Watts talked the entire time.

Overall, Watts' speech was rambling, incoherent and difficult to track and follow. She brought up unrelated topics from many years ago, and appeared to be paranoid when discussing her supervisor and co-workers. Based on observations of her mental and emotional state, Jaegle believed an assessment was necessary at that time to protect Watts' health and welfare, as well as the health and welfare of her patients. Jaegle was concerned Watts might be a threat to herself and she was not in a state to perform her job functions. Jaegle was also concerned that Watts' behavior could affect patient care if she were to provide counseling and therapy services to patients, many of whom have mental health issues in their own lives. (Jaegle Dec., ¶ 9). Thus,

Jaegle told Watts that she and Carroll were concerned for her and needed to take her down to the ED for an evaluation. (Jaegle Dec., ¶ 10); (Carroll Dec., ¶ 9); (Watts Dep., pp. 81-82).

When they arrived at the ED, the assistant manager of the BHED came down the hall and passed Watts, Carroll, and Jaegle. They briefly stood in the hall then went into the room where they were standing. Shortly after, Jaegle excused herself to her office to leave for a physical therapy appointment. (Jaegle Dec., ¶¶ 11-12); (Carroll Dec., ¶ 10); (Watts Dep., p. 83). After Jaegle left, Watts said, "Do you see what I mean? Did you see the way she [the assistant manager of the BHED] looked at me? I know she is telling everyone about me. I want it so that to get in my chart everyone has to break the glass and I want it checked out who has gotten in my chart." (Carroll Dec., ¶ 11). The ED RN then came in and began his assessment. He asked about Watts' health history then Watts asked to speak with him in private, so Carroll stepped out of the room for about 5 minutes. The RN completed his assessment and said the doctor would be in shortly. (Carroll Dec., ¶ 12); (Watts Dep., p. 84). Carroll then tried to talk to Watts about her dog and she showed Carroll a picture of the dog on her phone. Watts said she needed to call her parents, so she called her father. When she got off the phone, she said her father and uncle were coming to the ED to help protect her. She then went back to talking about how her father almost died in this hospital because he needed cardiac care, but no one would see him. (Carroll Dec., ¶ 13); (Watts Dep., p. 85). Watts referenced her phone again and said that "no one was going to get her phone because she had everything saved that would help her show what has been going on." She became emotional again several times, then pulled herself together quickly. (Carroll Dec., ¶ 14).

Watts also spoke about several family members who died of cancer. At times she would appear angry then she would stop talking and say, "[t]hat's all I am going to say about that." She said several times that she is "not crazy," and "all this would come out." Watts offered to Carroll

that she "did not have any thoughts of hurting herself." (Carroll Dec., ¶ 15). At about 11:00 a.m., Del Foreman ("Foreman") came to stay with Watts since Carroll had to leave. At the time, Foreman was employed by Methodist as a Nurse Manager. (Foreman Dec., ¶ 2). Foreman was asked by Dean Steiner to sit with Watts for a fit for duty assessment. (Foreman Dec., ¶ 3). Carroll introduced Foreman and Watts responded, "[o]h, I thought he was Don Dungan." Carroll told Foreman that we were waiting for the doctor and Carroll left the room. (Carroll Dec., ¶ 16). Foreman sat with Watts approximately 15-20 minutes before the ED physician came in to interview her. Foreman attempted to engage her in superficial conversation. Watts introduced the subject of being let go at the VA because she was a "whistleblower," but did not go into detail. She referenced an ongoing investigation and having provided "all the information to Aaron Shock." Watts remarked that she was "loved by everyone and it being documented in her evaluation." Foreman again attempted to steer the conversation to superficial topics like movies, television, and music. Watts indicated that she did not have preferences because she had to take care of her parents then spoke about their debilitations at length. Watts asked Foreman to leave when the physician came to speak with her then Foreman immediately left the room. (Foreman Dec., ¶ 4); (Watts Dep., pp. 89-91).

      The physician spoke to Watts for about 10-15 minutes. After the conversation, Foreman re-entered the room and attempted to re-engage Watts. She asked how much longer it would be; Foreman responded that he did not think it would be much longer. Watts then began looking at Foreman and made the comment that "she knows what's going on" and "knows she's being kept here against her will," as she "saw the police outside her room" (referring to the security guard standing at the ED nurse's station). Foreman informed her that the police were not outside her room, but rather it was a security guard standing at the desk. Watts appeared not to believe

Foreman, saying "I know what you're trying to do by talking about TV, movies and music . . . you're a skilled clinician and you're assessing me." Foreman assured her that his attempt at conversation had no ulterior motive. Watts again indicated she had "everything in her phone about what's been going on," while tapping the purse at her side. She did not elaborate about what she was referring to. (Foreman Dec., ¶ 5); (Watts Dep., p. 90). Watts then told Foreman she called her uncle and grandfather earlier and wondered what was taking them so long. When Foreman began to respond, she pushed the nursing call light while keeping eye contact with Foreman. She asked the nurse if her family had arrived and upon learning that her uncle was in the waiting room, she requested he be brought back to her. She asked Foreman to leave the room when her uncle arrived, and he complied. After Foreman left the room, he remained at the ED nurse's station, communicating with the lead nurse and Dean Steiner via phone.

At 12:50 p.m., Foreman noticed two Peoria Police Officers had arrived and wanted to see Watts because she had called them to report that "she's being kept in the ED against her will." The administrative director of the ED arrived several minutes later to speak to Watts and the police officers. Foreman then left the ED after Jaegle and Mary Bliss ("Bliss") arrived. (Foreman Dec., ¶ 6); (Watts Dep., pp. 94-95, 98). At the ED, Watts was given a note from the doctor stating "Does not require psychiatric admission at this time." (Watts Dep., p. 94). Watts was advised that she was free to leave the ED, but needed to go to IWIRC to complete the fit for duty examination. Watts was told that successful completion of the fit for duty examination was required before Watts could return to work and that failure to complete the examination could be grounds for termination. An appointment was scheduled at IWIRC for 2:15 p.m. on December 5, 2016. (Jaegle Dec. ¶ 15); (Watts Dep., p. 101).

8

On December 5, 2016, Watts was orally advised of her 2:15 p.m. appointment at IWIRC, and she would undergo a drug and alcohol screening there. However, Watts refused to go to the appointment because she did not trust IWIRC and was concerned IWIRC would alter the results to falsely show she had alcohol or drugs in her system. (Watts. Dep., pp. 102-103). That same day a letter was also sent to Watts confirming Jaegle's discussion with Watts regarding the IWIRC appointment and that her return to work was contingent upon a full release from IWIRC. Watts was further advised to contact Bliss if she had any questions about the appointment and to contact her manager, Dungan for any other general questions. (Jaegle Dec., ¶ 16, Ex. 1); (Watts Dep., pp. 105-106 and Ex. 6). Watts did not contact Bliss or Dungan and did not go to the IWIRC appointment. (Watts Dep., pp. 106-108). On December 6, 2016, Jaegle, Bliss, and Dungan called Watts and again requested that she complete the fitness examination. Watts was again advised that failure to go to IWIRC to complete the examination could jeopardize her employment but she again refused to comply. (Jaegle Dec., ¶ 17); (Watts Dep., pp. 110, 112).

Watts made additional calls to the Compliance Department on December 8, 9, and 11, 2016. On December 9, 2016, Watts called regarding a phone call she received from someone who identified himself as Cory with Perfect Choice, a roofing and window company. Watts believed that this call was associated with ongoing harassment from the hospital. On December 11, 2016, Watts called Compliance regarding a news report that a man fell off the parking deck of Proctor. Watts was concerned that this man may have been pushed off the deck for filing a whistleblower report and was concerned for other employees' safety. (Watts Dep., pp. 120-123).

Due to Watts' continued erratic behavior and absences, there was a growing concern for Watts' safety and wellbeing. The police were contacted to do a wellness check at Watts' home and they did. (Watts Dep., p. 121). On December 13, 2016, Bliss and Jaegle called Watts to

inform her of her rights under the Family Medical Leave Act and told her she should contact the Leaves Department to account for her absences since December 6, 2016. Watts hung up on Bliss and Jaegle. She did not call the Leaves Department and obtain/complete the paperwork to be on an approved leave. (Jaegle Dec., ¶ 18); (Watts Dep., pp. 126-127, 131). Effective December 20, 2016, Watts was terminated from her employment due to her work absences since December 6, 2016 and her failure to complete the fit for duty examination or obtain approval to be on a leave of absence. (Jaegle Dec., ¶ 19, Ex. 2).

On October 23, 2018, Watts filed the instant Complaint alleging Methodist violated the Americans with Disabilities Act, 42 U.S.C. § 1211 *et seq.* and Rehabilitation Act, 29 U.S.C. § 794, by requiring her to undergo an ER visit and I Works examination despite "no indication of physical and medical illness." Doc. 1, at 5. Methodist seeks summary judgment on Watts' claim.

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The Court must construe the record in the light most favorable to the nonmovant. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). To overcome the undisputed facts in a summary judgment motion, the nonmovant cannot rest on the allegations in his complaint but must point to evidence of an admissible sort that a genuine dispute of material fact exists. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). "[I]f the non-movant does not

come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment." *Waldridge*, 24 F.3d at 920.

## DISCUSSION

In December 2016, Methodist had a Fitness-For-Duty Assessment Policy, which included drug and alcohol testing. (Jaegle Dec., ¶ 13). Under the policy, Methodist could request an assessment for a variety of reasons such as rambling, fast speech, extraordinary bizarre behavior, extreme outburst without provocation, and disorientation. (Jaegle Dec., ¶ 13). The policy expressed that termination would result for a failure to complete a drug/alcohol screen. *Id.* On December 5, 2016, Methodist ordered Watts to undergo a fitness-for-duty examination, which included an evaluation in the emergency department and alcohol/drug testing. Watts never completed the second portion of the examination. In her Complaint, Watts challenges the fitness examination as unnecessary because she did not experience a physical or medical illness. Doc. 1.

Under the Americans with Disabilities Act, an employer cannot require a medical examination or inquiry into whether an employee is an individual with a disability or the nature or severity of the disability, "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). *See also* 29 C.F.R. § 1630.14(c). "A covered entity may [also] make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). Methodist concedes Watts was an "employee" subjected to a "medical examination." Doc. 31, at 15. Rather, the issue before the Court is whether the examination was "job-related and consistent with business necessity." *Id*.

An "examination is job-related and consistent with business necessity" if the "employer has a *reasonable belief* based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due

11

to a medical condition." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (emphasis added). The employer bears the high burden of establishing the business necessity exception applies. *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 523 (7th Cir. 2015). "[I]nquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the public at large." *Coffman*, 578 F.3d at 565. In *Coffman*, the Seventh Circuit found the fitness-for duty examinations ordered for firefighter Coffman were reasonable and consistent with the business necessity exception. *Id.* at 566. Multiple firefighters had expressed concerns about Coffman: she was outgoing but became guarded/defensive and appeared to suffer from paranoia; she seemed withdrawn, depressed, and uncommunicative; and she seemed unable to make decisions without being prompted. *Id.* at 565. The court found "[t]he Department ha[d] an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work." *Id.* at 566. Therefore, a psychological evaluation based on withdrawn and defensive behavior in this special work environment was reasonable. *Id*.

Likewise, in *Kurtzhals v. Cty. of Dunn,* 969 F.3d 725, 730–31 (7th Cir. 2020), the Seventh Circuit found the ordered fitness-for-duty examination was reasonable and consistent with the business necessity exception. *Id*. There, a police department ordered a sergeant to undergo a fitness-for-duty evaluation after he threatened violence against a co-worker in violation of the workplace policy *Id.* at 727. The court held "[b]ecause Kurtzhals was a police officer and responsible for public safety, his 'well-being was essential not only to his safety but to the public at large; thus, the Department had a particularly compelling interest in assuring that he was both physically and mentally fit to perform his duties.'" *Id.* at 731 (quoting *Coffman*, 578 F.3d at 565).

Thus, the Seventh Circuit affirmed the district court's grant of summary judgment on the plaintiff's 42 U.S.C. § 12112(d)(4)(A) claim.

This case involves a situation where a clinical social worker who primarily treated children and teens for mental health was exhibiting behavior which caused concern regarding her own mental well-being. In its Motion, Methodist argues it did not discriminate against Watts by ordering a fitness-for-duty examination because it had objective evidence to reasonably believe Watts' medical condition posed a threat or would impair her ability to perform her essential job functions. Doc. 31, at 17. Thus, Methodist asserts it was justified in terminating Watts because she refused to complete the examination and was not cleared to return to work.

### A. Essential Job Function

In determining a job's essential functions within meaning of the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description ... for the job, this description shall be considered evidence of the essential functions of the job." *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019), *as amended* (Aug. 9, 2019) (quoting 42 U.S.C. § 12111(8)) (discussing the factual essential-function inquiry within the context of whether a person is a "qualified individual"). As to Watts' job function, it is undisputed that Watts was employed by Methodist as of December 5, 2016 as a mental health clinician. In that role, she primarily worked with children and teenagers. Her duties included conducting initial assessments, creating treatment plans, and providing counseling and therapy to children from ages 4 to 18. These counseling and therapy services addressed a large variety of mental health issues, including anxiety and depression. Watts also led group therapy for adults in a partial hospitalization program. Watts

was required to obtain a licensure in clinical social work in the State of Illinois to perform these services and did maintain such licensure.

The Court does not opine on whether a special deference should be applied to Methodist's decision because Watts was in a "special work environment," but the Court considers Watts' role in determining whether the fitness examination was a business necessity. Business necessities vary depending on the workplace. *Coffman*, 578 F.3d at 565 (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 99 (2d Cir. 2003)). While Watts did not face the general public like a police officer or firefighter would, she performed mentally demanding work. She provided services to vulnerable people who were in need of mental health treatment and conducted these services in sensitive settings (i.e. counseling young children, seeing patients in one-on-one sessions, and assisting patients in hospitalization programs). Her mental health could impact the treatment of children, especially when she was experiencing seemingly irrational and paranoid thoughts the same day that she was treating patients. (Jaegle Dec., ¶ 9). Plaintiff's own admission supports this where she admitted to Moore from the Compliance Department that she should not be seeing patients that day. (Moore Dec., ¶ 8).

### B. Reasonable Belief Based on Objective Evidence

Methodist asserts it obtained objective evidence through Jaegle's personal observation of Watts and through additional details provided by other colleagues' interactions with Watts. Doc. 31, at 17. This evidence was obtained prior to the fitness-for-duty examination and continued during the examination, which Watts did not complete. Based on this evidence, Methodist became concerned that Watts' mental health issues created a threat to her own safety, the safety of her patients, and her ability to provide mental health services. *Id*.

Objective evidence supporting a decision to request an evaluation can be established based on the observations of one's co-workers and an individual's own statements. *See e.g., Coffman*, 578 F.3d at 565 (discussing reports from multiple firefighters about the plaintiff's behavior which formed the basis for the fitness examination requests); *Kurtzhals*, 969 F.3d at 727 (basing the examination request on the plaintiff's conduct and words to another at work corroborated by multiple witnesses). Evidence of "annoying or inefficient [behavior] does not justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions." *Wright*, 798 F.3d at 524. "[A] safe workplace is a paradigmatic necessity of operating a business[,]" otherwise an employer could risk a negligence suit. *Painter v. Illinois Dep't of Transportation*, 715 F. App'x 538, 541 (7th Cir. 2017) (quoting *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995)). *See also, Milliman v. Cty. of McHenry*, 893 F.3d 422, 434 (7th Cir. 2018) (holding it was proper for a county to refer a deputy to psychological evaluation after he alleged bizarre widespread corruption, human trafficking, and solicitation of murder by the Sheriff). Thus, "[a]n employer does not have to wait for a disabled employee in a sensitive position to injure someone before it can evaluate the employee's fitness for duty." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015) (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006)). Likewise, "[t]he ADA does not require [a hospital] to walk 'on a razor's edge—in jeopardy of violating the ADA if it fired such [a psychologist who risked the health and safety of its patients through his memory impairment], yet in jeopardy of being deemed negligent if it retained him and he hurt someone.'" *Id.* at 295 (quoting *Palmer v. Circuit Court of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997)).

Watts' behavior was more than a mere annoyance or inefficiency; co-workers from various departments at Methodist described her speech as rambling, incoherent, fearful,

accusatory, and angry at times. Based on the undisputed facts, Watts exhibited various bizarre behaviors on December 5 leading up to Methodist's decision to order the fitness examination. It began with Watts asking to specifically speak with Moore in Compliance in person because she believed the phone lines were tapped. Upon speaking with Moore, Watts alleged that her supervisor Dungan conspired with other hospital staff to intentionally delay care to her father in October 2016 so that he would die, and Watts would not miss work caring for him. Watts reported that Dungan illegally accessed records and harassed Watts through negative evaluations and text messages. Watts also stated she could not address these concerns with Director Steiner due to conflicts of interest and because Dungan had been friends with Steiner for 25 years. Watts cried while recounting her fears about Dungan and stated she did not know what to do. All of this occurred the same day Watts was to treat patients.

After the call, two Methodist employees were sent to assess whether a fitness-for-duty examination was necessary: Carroll, a Nurse Manager from the Adult Behavioral Health Unit, and Jaegle, the Director of Compensation and Integration. According to Carroll and Jaegle, Watts' speech was rambling, incoherent, and difficult to follow. She brought up unrelated topics from many years ago and appeared paranoid when discussing her supervisor and co-workers. She spoke about her past work for the VA where events occurred that were being investigated and she expressed feelings of blaming herself for the suicide of her co-worker. Watts returned to alleging Dungan was against her along with another co-worker who formerly worked for Methodist. She recounted her position that Dungan tried to kill her father and added that Dungan's husband worked in the unit where her father was treated. Based on observations of her mental and emotional state including intermittent crying, Jaegle ordered the fitness-for-duty examination.

The Court agrees that the examination was related to Methodist's concerns about Watts' ability to perform her job, particularly where her performance was imminent as she had sessions scheduled that same day. (Jaegle Dec., ¶ 9). Providing mental health services was a central duty to Watts' role and mental health was Methodist's central concern about Watts, which resulted in the exam request. *Id*. As evidenced by the declaration from Jaegle, Methodist was concerned that Watts' mental health issues created a threat to the health and safety of her patients who she treated for anxiety and depression. *Id*. Watts even admitted that she should not see patients that day. Moreover, Methodist took action the same day it observed this behavior from Watts rather than allowing her to see patients. *Cf. e.g.*, *Wright*, 798 F.3d at 524 (describing an employer who allowed a Department of Children and Family Services caseworker to continue overseeing cases involving children for two months after it requested the worker to undergo a fitness evaluation). Thus, at the time Methodist ordered the initial examination, it was clearly related to Watt's job and a business necessity to ensure the safety of Watts and others.

**C. Additional Examination**

Regardless of whether the drug testing was part of the initial examination or a second examination request, Methodist was justified in ordering such examination. An ED physician eventually gave Watts a note stating, "Does not require psychiatric admission at this time." Doc. 31-1, at 64. However, Watts continued to exhibit bizarre behavior while in the ED. With a clear fixation on her supervisor Dungan, she described conspiracy theories among Dungan and staff members who treated her father and even mistook Foreman for Dungan's husband upon introduction in the ED. (Carroll Dec., ¶ 13); (Watts Dep., p. 85). Her emotional state varied between anger, paranoia, and upset to quickly pulling herself together. (Carroll Dec., ¶¶ 11, 14, 15). Watts made further paranoid statements: She told Carroll, "Do you see what I mean? Did

you see the way she [the assistant manager of the BHED] looked at me? I know she is telling everyone about me. I want it so that to get in my chart everyone has to break the glass and I want it checked out who has gotten in my chart."; Watts made several statements that she is "not crazy, and all this would come out."; Watts spoke about being let go from the VA because she was a "whistleblower"; she said to both Carroll and Foreman at different times that "no one was going to get her phone because she had everything saved"; and she made comments to Foreman that she "knows what's going on"; she "knows she's being kept here against her will," as she "saw the police outside her room" (referring to the security guard standing at the ED nurse's station). *See generally* (Carroll Dec.); (Foreman Dec.). At some point, Watts was the one who actually called the police because "she was being kept against her will."

As discussed in the cases cited above, courts have found paranoid and angry behavior witnessed by multiple co-workers to be an appropriate basis for an employer to order a fitness-for-duty examination, particularly employees in special work environments. Therefore, it was reasonable for Methodist to further require Watts to submit to a drug and alcohol examination at IWIRC that same day. She alleged widespread conspiracy across departments including individuals "getting into her chart." She fixated on the suicide of her former co-worker and "whistleblowers," oftentimes through rambling, monologue speech with abrupt stops and changes to unrelated topics. Watts' reasoning for refusing to attend the IWIRC appointment further evidenced her unusually paranoid state. She stated she did not trust IWIRC and was concerned it would alter the results of her exam to falsely show she had alcohol or drugs in her system. (Watts. Dep., pp. 102-103). Watts maintained this position in her deposition: "I thought how corrupt can one place be? I mean, what else is going to happen here? I don't trust them. I was scared that I was even going to get out to my car." *Id*.

18

Methodist also gave Watts extended time to complete the examination beyond the initial date where she experienced the episode which triggered Methodist's concerns. (Jaegle Dec., ¶ 16-19). Further, while not relevant to the initial determination, Methodist was continually concerned about Watts' fitness between December 5 and the date of her termination on December 20. Such concern resulted in Methodist contacting police to perform a wellness check at Watts' home. Doc. 31, SOF 43; (Watts Dep., p. 121). Based on the undisputed facts, Watts continued to call the Compliance Department raising conspiracy theories accusing the hospital of harassing her via a phone call from a roofing company and alleging that a man was pushed off a parking deck of Methodist's property because he was a "whistleblower." *See* Doc. 31-1, at 61-62. During this time, Defendant again requested Watts to submit to further examination, but she refused to do so, which eventually resulted in her termination. *Id.* at 65-66.

In sum, when viewing the facts in a light most favorable to Watts, Methodist's decision to require Watts to undergo a fitness-for-duty examination was reasonable and consistent with the business necessity exception under 42 U.S.C. § 12112(d)(4).

## CONCLUSION

For the reasons set forth above, Plaintiff's Motions (Docs. 32, 33) for Leave to file Response to Defendant's Motion are DENIED. Defendant Methodist's Motion (Doc. 31) for Summary Judgment is GRANTED. The Clerk is directed to close this case.

Signed on this 9th day of June, 2021.

                                                      s/ James E. Shadid
                                                     James E. Shadid
                                                     United States District Judge